**WELLS FARGO BANK NORTHWEST, N.A., not in its individual capacity but solely in its corporate capacity as owner trustee, Appellant,**

v.

**RPK CAPITAL XVI, L.L.C. and RPK Capital Management, L.L.C., Appellees.**

No. 05–10–00565–CV.

Court of Appeals of Texas, Dallas.

Feb. 16, 2012.

Rehearing Overruled March 19, 2012.

---

Scott T. Williams, Roderick L. Wilson, Akin Gump Strauss Hauer & Feld LLP, Dallas, for Appellant.

Christopher D. Kratovil, Dykema Gossett PLLC, David Weitman, James H. Billingsley, K & L Gates LLP, Christopher A. Brown, Winstead PC, Kevin B. Wiggins, White & Wiggins, L.L.P., Carlos Morales, Adorno Yoss White & Wiggins, LLP, Dallas, Jamie Ellen Lavergne Bryan, Winstead PC, Fort Worth, for Appellees.

Before Justices BRIDGES, O'NEILL, and FILLMORE.

## OPINION

Opinion By Justice FILLMORE.

RPK Capital XVI, L.L.C. and RPK Capital Management, L.L.C. (collectively RPK) sued Wells Fargo Bank Northwest, N.A., in its corporate capacity as owner trustee of an aircraft (Wells Fargo), for conversion and for a declaratory judgment that RPK owns and is entitled to possession of an aircraft thrust reverser. Following a bench trial based partially on stipulated facts, the trial court awarded RPK possession of the thrust reverser, $848,480 in damages, and $624,743.90 in attorneys' fees for trial and contingent attorneys' fees on appeal. In seven issues, Wells Fargo argues (1) RPK's conversion claim is barred by the statute of limitations, (2) RPK was not entitled to possession of the thrust reverser because the thrust reverser is an accession to an aircraft that Wells Fargo acquired in the ordinary course of business, (3) the trial court erred by awarding RPK damages for a defect in the thrust reverser that was discovered, but not caused, by Wells Fargo, (4) RPK's damages model was based solely on the unreliable testimony of an expert witness, (5) even if the expert testimony was reliable, the evidence was insufficient to support the amount of past and future lost profits awarded by the trial court, and (6) the trial court erred by awarding RPK attorneys' fees. We affirm in part, reverse and render in part, and reverse and remand in part.

## Stipulated Facts

The case was presented to the trial court partially on stipulated facts and partially on evidence offered at trial. As relevant to the issues on appeal, the parties' stipulations established that, on December 29, 1998, Provident Commercial Group, Inc. (Provident) entered into a lease agreement with American Trans Air, Inc. for an aircraft engine, a thrust reverser, and related equipment.[1] The lease identified the thrust reverser by two generic part numbers, LJ76612 for the left-hand thrust reverser and LJ76610 for the right-hand

---

1. Although not included in the stipulated facts, both parties represent on appeal that a thrust reverser is a piece of equipment that is used to help slow an aircraft upon landing.

thrust reverser, rather than by serial numbers.[2] Although the engine lease was recorded with the Federal Aviation Administration in January 1999, there is no public registry for thrust reversers.

In 2003, Provident changed its name to Information Leasing Corporation (IFC), and American Trans Air, Inc. changed its named to ATA Airlines, Inc. (ATA). On December 29, 2003, IFC assigned the lease to Provident Bank. In 2004, ATA filed for bankruptcy. One of ATA's assets in the bankruptcy was an aircraft it leased from FINOVA Capital Corporation (FINOVA). In the 2004 bankruptcy, ATA rejected the lease with FINOVA. ATA surrendered the aircraft to FINOVA in December 2004. In the 2004 bankruptcy, ATA assumed the lease with Provident for the aircraft engine and the thrust reverser. The lease was subsequently assigned by Provident Bank to LINC Capital, Inc. (LINC). In 2005, LINC assigned the lease to RPK Capital V, L.L.C. and, in 2008, RPK Capital V assigned the lease to RPK Capital XVI, L.L.C.

At some point, FINOVA and related entities filed for bankruptcy. On August 10, 2001, the bankruptcy court confirmed FINOVA's plan of reorganization. FINOVA's 2001 Securities and Exchange Commission Form 10K indicated that as part of its business, FINOVA treated as assets and regularly sold aircraft to third parties at the end of lease terms and that FINOVA had historically "earned total proceeds from the sale of assets upon lease termination in excess of carrying amounts." The 2001 Form10K also stated, "[T]he main objective of the Debtors' post-confirmation business plan is to maximize the value of their portfolio through the orderly liquidation of the portfolio over time" and that "[T]he Debtors' largest line of business is Transportation Finance, which primarily consists of various forms of financing of used aircraft." FINOVA's Securities and Exchange Commission Form 10–Q for the quarter ending June 30, 2008 stated:

> Since emergence from chapter 11 bankruptcy proceedings in August 2001, our business activities have been limited to maximizing the value of our portfolio through the orderly collection of our assets. . . . We have substantially completed the liquidation of our portfolio and our focus has shifted to the continued wind down of our operations and future dissolution of our entities.

On September 19, 2005, Talos Aviation Limited (Talos) entered into a letter of intent with FINOVA to purchase the aircraft formerly leased by ATA. On October 7, 2005, FINOVA sold the aircraft to Talos. Talos then conveyed the aircraft to Wells Fargo as owner-trustee.

In April 2008, ATA again initiated a bankruptcy proceeding. Prior to filing the 2008 bankruptcy, ATA made its annual lease payment to RPK and provided proof of insurance and financial records as required by the lease. In ATA's 2008 bankruptcy, RPK sought adequate protection of the equipment subject to the lease, including the thrust reverser and related records. On April 25, 2008, RPK made demand on Wells Fargo for "removal and return of a thrust reverser."

In early May 2008, RPK began an investigation to determine the serial numbers of the thrust reverser that was the subject of

---

2. We recognize the thrust reverser is actually two pieces of equipment, one designed to fit under the left wing and the other designed to fit under the right wing of the aircraft. However, in its findings of fact and conclusions of law, the trial court referred to this equipment as a single "thrust reverser" and, for consistency, we will also utilize that terminology in this opinion.

the lease. In May 2008, the serial numbers on the thrust reverser attached to the aircraft Wells Fargo purchased from FINOVA were 1267003 for equipment on the left side of the aircraft and 1267002 for equipment on the right side of the aircraft. In May 2008, RPK made a more specific demand that Wells Fargo return the thrust reverser bearing those two serial numbers.

On May 27, 2008, NORDAM, a company specializing in the detailed inspection of thrust reversers, conducted an inspection of the thrust reverser at Wells Fargo's request. The May 2008 inspection was not required by the lease. During the inspection, NORDAM found delamination on sections of the thrust reverser.[3] Because of the delamination, the thrust reverser was tagged as unserviceable. Thrust reversers are interchangeable parts that can be removed from one aircraft and installed on another. In December 2008, the thrust reverser was removed from the aircraft owned by Wells Fargo. Removal of the thrust reverser caused no damage to the aircraft.

The parties introduced additional evidence at trial on several disputed issues. We will discuss the disputed evidence later in this opinion as necessary to address Wells Fargo's complaints on appeal. Of note, a significant contested issue at trial was whether the thrust reverser on the aircraft owned by Wells Fargo was the thrust reverser that was the subject of the lease between Provident and American Trans Air. Wells Fargo has not challenged on appeal the trial court's finding the thrust reverser on the aircraft purchased from FINOVA was the thrust reverser that was the subject of the lease and, accordingly, we need not address the evidence introduced at trial relating to this issue.

The trial court found Wells Fargo converted the thrust reverser and awarded RPK possession of the thrust reverser, $848,480 in damages, and $624,743.90 in attorneys' fees for trial and contingent attorneys' fees on appeal. The trial court entered findings of fact and conclusions of law based on both the stipulated and contested facts.

## Standard of Review

Stipulations of fact are binding on the parties, the trial court, and the reviewing court. *Panther Creek Ventures, Ltd. v. Collin Cent. Appraisal Dist.*, 234 S.W.3d 809, 811 (Tex.App.-Dallas 2007, pet. denied). We do not review the legal or factual sufficiency of the evidence in a case tried on stipulated facts. *Id.* Rather, we review de novo whether the trial court correctly applied the law to the stipulated facts. *Id.*

As to the issues that were disputed, in an appeal from a bench trial, the trial court's findings of fact have the same force and effect as jury findings. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex.1991); *Walker v. Anderson*, 232 S.W.3d 899, 907 (Tex.App.-Dallas 2007, no pet.). Unchallenged findings of fact are binding on the appellate court, unless the contrary is established as a matter of law or there is no evidence to support the finding. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex.1986); *Walker*, 232 S.W.3d at 907. When the appellate record contains a reporter's record, as it does in this case, findings of fact on the disputed issues are not conclusive and may be challenged for sufficiency of the evidence. *Sixth RMA Partners, L.P.*

---

**3.** Although not contained in the parties' stipulations, the record reflects delamination is the separation of the thin metal skin of the thrust reverser from the base underneath it.

*v. Sibley,* 111 S.W.3d 46, 52 (Tex.2003); *Las Colinas Obstetrics–Gynecology–Infertility Ass'n, P.A. v. Villalba,* 324 S.W.3d 634, 638 (Tex.App.-Dallas 2010, no pet.). We review a trial court's findings of fact under the same legal and factual sufficiency of the evidence standards used when determining if sufficient evidence exists to support an answer to a jury question. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994); *Darocy v. Abildtrup,* 345 S.W.3d 129, 136 (Tex.App.-Dallas 2011, no pet.).

 We review a trial court's conclusions of law de novo. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002); *Darocy,* 345 S.W.3d at 136. We independently evaluate the trial court's conclusions of law to determine whether the trial court correctly drew the legal conclusions from the facts. *Walker,* 232 S.W.3d at 908; *see also BMC Software,* 83 S.W.3d at 794. We must uphold the trial court's conclusions of law if any legal theory supported by the evidence can sustain the judgment. *OAIC Commercial Assets, L.L.C. v. Stonegate Vill., L.P.,* 234 S.W.3d 726, 736 (Tex.App.-Dallas 2007, pet. denied). We will reverse the trial court's judgment only if the conclusions are erroneous as a matter of law. *Id.*

## Statute of Limitations

 In its first issue, Wells Fargo asserts the trial court erred by concluding that RPK's conversion claim is not barred by the statute of limitations. Wells Fargo asserts (1) RPK's conversion claim against Wells Fargo accrued in October 2005 when Wells Fargo, through Talos, purchased the aircraft and took possession of the thrust reverser, (2) RPK failed to file suit within two years of the date the claim accrued, and (3) the discovery rule is not applicable to toll the running of the limitations period. Wells Fargo had the burden to prove the affirmative defense of the statute of limitations. *See Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.,* 300 S.W.3d 348, 376 (Tex.App.-Dallas 2009, pet. denied) (op. on reh'g).

 Conversion is the "unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights." *Waisath v. Lack's Stores, Inc.,* 474 S.W.2d 444, 447 (Tex.1971); *see also Tex. Integrated Conveyor Sys., Inc.,* 300 S.W.3d at 365. To establish conversion of personal property, a plaintiff must prove (1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) the defendant, unlawfully and without authorization, assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiff's rights; (3) the plaintiff made a demand for the property; and (4) the defendant refused to return the property. *Tex. Integrated Conveyor Sys., Inc.,* 300 S.W.3d at 365–66. The plaintiff must also establish he was injured by the conversion. *United Mobile Networks, L.P. v. Deaton,* 939 S.W.2d 146, 147 (Tex.1994) (per curiam); *Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.,* 287 S.W.3d 877, 889 (Tex.App.-Dallas 2009, no pet.).

 A person must bring suit for the conversion of personal property "not later than two years after the day the cause of action accrues." Tex. Civ. Prac. & Rem.Code Ann. § 16.003(a) (West Supp. 2011); *see also Pollard v. Hanschen,* 315 S.W.3d 636, 641 (Tex.App.-Dallas 2010, no pet.). "Generally, a cause of action accrues when a wrongful act causes a legal injury. The date a cause of action accrues is normally a question of law." *Etan Indus., Inc. v. Lehmann,* 359 S.W.3d 620, 623 (Tex.2011) (per curiam) (citations omitted).

Generally, the limitations period for a conversion claim begins to run at the time of the unlawful taking. *Pipes v. Hemingway*, 358 S.W.3d 438, 450 (Tex. App.-Dallas 2012, no pet. h.); *Autry v. Dearman*, 933 S.W.2d 182, 193 (Tex.App.-Houston [14th Dist.] 1996, writ denied). However, if the original possession of the property is lawful, the limitations period does not begin to run until the return of the property has been demanded and refused, or until the person in possession has unequivocally exercised acts of domination over the property inconsistent with the claims of the owner or the person entitled to possession. *Sharpe v. Roman Catholic Diocese*, 97 S.W.3d 791, 796 (Tex.App.-Dallas 2003, pet. denied); *Rogers v. Ricane Enter., Inc.*, 930 S.W.2d 157, 166 (Tex.App.-Amarillo 1996, writ denied). Without stating a specific date that RPK's cause of action accrued, the trial court concluded RPK's conversion claim was not barred by limitations. Accordingly, the trial court necessarily concluded RPK's conversion claim accrued within two years of filing suit.

Relying on *Steinhagen v. Ehl*, 126 S.W.3d 623 (Tex.App.-Beaumont 2004, pet. denied), Wells Fargo asserts its initial possession of the thrust reverser was unlawful and, therefore, RPK's cause of action for conversion against Wells Fargo accrued in October 2005 when Wells Fargo, through Talos, purchased the aircraft, including the thrust reverser, from FINOVA. In *Steinhagen*, Bob Ehl leased a convenience store, including two fuel pumps, to Damon Webb effective February 1, 1997. *Id.* at 624–25. On January 31, 1997, E.H. Steinhagen, III, the president and sole shareholder of PetroTex Fuels, Inc., entered into a Fuel Consignment Agreement with Webb allowing Webb to sell PetroTex's fuel at the convenience store. *Id.* at 625. Webb and Steinhagen also negotiated an "arrangement" where the fuel pumps on the prop-erty would be replaced with new fuel pumps paid for by PetroTex. *Id.* In August 1997, the old pumps were removed from the property and sold to Jim White. *Id.* In March 1999, Webb defaulted on the lease with Ehl. *Id.*

Ehl sued Steinhagen and PetroTex for conversion of the original pumps. A jury found Steinhagen and PetroTex converted the property and awarded Ehl $35,431 in actual damages and awarded exemplary damages against both defendants. *Id.* at 626. The jury also found that Ehl could have discovered the fuel pumps were missing in "Fall to Winter '98" and that Ehl's conduct waived his conversion claim. *Id.* The trial court disregarded the jury's finding on waiver and awarded judgment in favor of Ehl for $115,431. *Id.*

On appeal, Steinhagen and PetroTex argued the trial court erred by applying the discovery rule to extend the accrual of Ehl's conversion claim. Without substantive analysis, the court of appeals concluded that, even though Webb's initial possession of the fuel pumps was lawful under the lease agreement with Ehl, Steinhagen and PetroTex's removal and sale of Ehl's pumps "belongs" in the "unlawful possession" class of conversion cases. *Id.* at 627. The court of appeals further determined that Webb's possession of the pumps at the time the conversion was committed "would not, in and of itself, trigger the application of the discovery rule." *Id.* The court of appeals concluded the legal injury rule, rather than the discovery rule, applied to Ehl's conversion claim against Steinhagen and PetroTex and, therefore, the claim was barred by limitations. *Id.*

The Corpus Christi Court of Appeals employed a different analysis in *Hofland v. Elgin–Butler Brick Co.*, 834 S.W.2d 409 (Tex.App.-Corpus Christi 1992, no writ). In *Hofland,* Elgin–Butler Brick and Bor-

der Brick and Supply, Inc. had an agreement pursuant to which Elgin–Butler sold brick and Border Brick collected payments for the brick, retained a commission, and forwarded the remaining money to Elgin–Butler. *Id.* at 411. The parties also had a lease agreement permitting Elgin–Butler to store brick on Border Brick's property. *Id.* Border Brick fell behind on payments to Elgin–Butler, and Elgin–Brick filed suit to recover the unpaid sums. *Id.* In November 1984, Joyce Hofland, a director and shareholder in Border Brick, agreed to sell Border Brick's assets to Juan Garza. *Id.* The contract encompassed all assets of Border Brick, including "brick." *Id.* Garza then moved the brick owned by Elgin–Butler to another storage facility. *Id.* at 411–12. Although Hofland objected to Garza moving the brick, she did not inform Elgin–Butler that the brick had been moved. *Id.* at 412. Elgin–Butler discovered the sale of the brick in August of 1988 and amended its petition to include a conversion claim against Hofland and Border Brick. *Id.* The trial court awarded Elgin–Butler damages for the conversion and determined the claim was not barred by limitations because it was not discovered until August 1988 and because Hofland fraudulently concealed the sale. *Id.*

The court of appeals first concluded there was sufficient evidence to support the trial court's finding that the conversion occurred when Hofland sold Border Brick's assets to Garza. *Id.* It then turned to the issue of when Elgin–Butler's conversion claim accrued and specifically addressed the situation presented in this case:

> For example, if a chattel is placed in possession of a bailor, and the bailor secretly sells the chattel to a third person, thereby converting it, the true own-

er has no reason to know of the conversion. In such cases, the cause of action must accrue after some type of notice of the conversion has occurred. If the cause of action accrued upon the acts of conversion, as appellant argues, the parties in lawful possession of property would be in a position to secretly and unlawfully acquire or transfer ownership rights through conversion. If the cause of action accrued upon demand and refusal, the plaintiff could indefinitely suspend the statute of limitations, a result substantive limitations law does not permit.

We therefore hold that the proper rule of accrual for conversion actions in cases in which possession is initially lawful and demand and refusal is useless, or unequivocal acts of conversion have occurred, is that the cause of action accrues upon demand and refusal, or discovery of facts supporting the cause of action, whichever occurs first.

*Id.* at 414 (citations omitted); *see also Varel Mfg. Co. v. Acetylene Oxygen Co.,* 990 S.W.2d 486, 497–98 (Tex.App.-Corpus Christi 1999, no pet.) (conversion claim against lessee accrued when lessee stopped paying rent on cylinders and denied it possessed cylinders); *Pierson v. GFH Fin. Servs. Corp.,* 829 S.W.2d 311, 314 (Tex. App.-Austin 1992, no writ) (per curiam) ("If the convertor took possession in subordination to the owner's title, the statute does not begin to run as long as the relationship of the parties continues or, if the contractual relation was repudiated, until the notice of the repudiation is conveyed to the owner, either directly or by adverse acts or claim of ownership so notorious that the owner may be presumed to have known thereof.").[4]

***

4. *See also Ayers v. Greater Houston Pipe, L.C.,* No. 01–98–01022–CV, 2000 WL 1678443, at

*3, n. 3 (Tex.App.-Houston [1st Dist.] Nov. 9, 2000, no pet.) (not designated for publication)

 Wells Fargo argues the discovery rule should not apply to RPK's conversion claim because Wells Fargo's possession was initially unlawful and RPK's injury was not inherently undiscoverable. We disagree. The discovery rule is a very limited exception to statutes of limitations, and applies only when the nature of the plaintiff's injury is inherently undiscoverable and the evidence of injury is objectively verifiable. *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 65–66 (Tex.2011); *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455–56 (Tex. 1996). An injury is inherently undiscoverable if, by its nature, it is unlikely to be discovered during the applicable limitation period despite the exercise of due diligence. *Marshall*, 342 S.W.3d at 66; *S.V. v. R.V.*, 933 S.W.2d 1, 7 (Tex.1996). The question is not whether the particular injury was actually discovered by the claimant within the limitation period, but whether "it was the type of injury that is generally discoverable by the exercise of reasonable diligence." *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998). In other words, whether the discovery rule applies is determined on a categorical basis, because such an approach "brings predictability and consistency to the jurisprudence." *Apex Towing Co. v. Tolin*, 41 S.W.3d 118, 122 (Tex. 2001); *see also Marshall*, 342 S.W.3d at 65–66. Therefore, the focus is on whether a *type* of injury, rather than a *particular* injury, was discoverable. *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313–14 (Tex. 2006) (per curiam).

 We conclude the category of conversion cases in which a lessee lawfully in possession of a lessor's property secretly sells or transfers the lessor's property to a third party, but continues to comply with its obligations under the lease, involves injury that is both inherently undiscoverable and objectively verifiable. The discovery rule is applicable to this category of cases regardless of whether the defendant is the lessee who transferred the property or the person currently in possession of the property. *See Childs v. Haussecker*, 974 S.W.2d 31, 40 (Tex.1998) (discovery rule delays accrual of cause of action until plaintiff knew or should have known of its injury, not the identity of wrongdoer); *Baxter v. Gardere Wynne Sewell LLP*, 182 S.W.3d 460, 463 (Tex.App.-Dallas 2006, pet. denied). For this category of cases, the cause of action does not accrue until the lessor (1) demands return of the property and is refused, or (2) learns of facts supporting the cause of action, whichever occurs first. *Hofland*, 834 S.W.2d at 414; *see also Varel Mfg. Co.*, 990 S.W.2d at 498; *Pierson*, 829 S.W.2d at 314–15.

In this case, a lessee, ATA, was in lawful possession of property owned by the lessor, RPK. Without notifying RPK, ATA transferred the property to a third person, FINOVA, and FINOVA transferred the property, through Talos, to Wells Fargo. ATA, however, continued to comply with its contractual obligations by paying the amounts owed under the lease and by providing RPK with proof of insurance and records relating to the thrust reverser. After ATA rejected the lease in the 2008 bankruptcy, RPK learned that ATA no longer had the thrust reverser in its possession. At this point, RPK's claim for conversion accrued. RPK filed suit within two years of the accrual of its claim. We

---

(owner of Corvette left car with lessee of premises for restoration; lessee of premises abandoned car when it vacated the premises and lessor sold car; owner's cause of action for conversion against subsequent purchaser of car accrued when owner discovered car was missing from premises).

conclude the trial court did not err by concluding RPK's conversion claim is not barred by the statute of limitations. We resolve Wells Fargo's first issue against it.

### Buyer in Ordinary Course

In its second issue, Wells Fargo asserts the trial court erred by awarding RPK possession of the thrust reverser because, pursuant to the business and commerce code, Wells Fargo had superior title to the thrust reverser. Wells Fargo specifically argues the thrust reverser was an accession to the aircraft purchased by Wells Fargo and that Wells Fargo purchased the aircraft in the ordinary course of business.

Contracts relating to the lease of goods are governed by article 2A of the Uniform Commercial Code (UCC), adopted in Texas as chapter 2A of the business and commerce code. TEX. BUS. & COM.CODE ANN. §§ 2A.101, 2A.102 (West 2009). Other than exceptions not applicable to this case, under the UCC, a "good" includes "all things that are moveable at the time of identification to the lease contract." *Id.* § 2A.103(a)(8). Generally, a buyer from the lessee of goods under an existing lease contract obtains, to the extent of the interest transferred, the leasehold interest in the goods that the lessee had or had power to transfer. *Id.* § 2A.305(a).

■ A leased good becomes an "accession" when it is installed in or affixed to other goods. *Id.* § 2A.310(a). Generally, the interest of a lessor under a lease contract that was entered into before the good became an accession is superior to all interests in the whole. *Id.* § 2A.310(b). However, the interest of a lessor under a lease contract entered into before the good became an accession is subordinate to the interest of a buyer in the ordinary course of business of any interest in the whole acquired after the good became an acces-

sion. *Id.* § 2A.310(d)(1). A buyer in the ordinary course of business is:

> a person who in good faith and without knowledge that the sale to him or her is in violation of the ownership rights or security interest or leasehold interest of a third party in the goods buys in the ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker.

*Id.* § 2A.103(a)(1). Comment (a) to section 2A.103, relating to buyer in the ordinary course of business, refers to "Section 1–201(9)." Section 1.201(b)(9) of the business and commerce codes states, in relevant part:

> "Buyer in ordinary course of business" means a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind. A person buys in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practice.

TEX. BUS. & COM.CODE ANN. § 1.201(9) (West 2009). Buying a good from inventory generally satisfies the requirements that buying be in ordinary course and the seller be in the business of selling such goods. *In re Winn's Stores, Inc.,* 177 B.R. 253, 257 (Bankr.W.D.Tex.1995).

We turn first to the issue of whether Wells Fargo was a buyer in the ordinary course of business, an affirmative defense on which Wells Fargo had the burden of proof. *See THPD, Inc. v. Cont'l Imports, Inc.,* 260 S.W.3d 593, 614 (Tex.App.-Austin 2008, no pet.). The trial court determined FINOVA sold the aircraft as part of its liquidation and that FINOVA was not in the business of selling aircraft. The trial

court concluded, "As a matter of law, a purchase made as part of a liquidation sale does not qualify as a sale in the ordinary course of business."

▮▮ A liquidation can be a sale that does not qualify as being in the ordinary course of business. *See Sindone v. Farber*, 432 N.Y.S.2d 778, 781, 105 Misc.2d 634, 638–39 (Sup.Ct.1980); *see also Lopa v. Selgar Realty Corp., (In re Selgar Realty Corp.)*, 85 B.R. 235, 240 (Bankr. E.D.N.Y.1988) (Under the bankruptcy code, "The sale of a substantial part of a debtor's inventory is not in the ordinary course of business since it is not in the ordinary course to engage in one's own liquidation."). However, courts have also recognized that a sale made during a liquidation or a bankruptcy could, under certain circumstances, be a sale made in the ordinary course of business. *See In re Circuit City Stores, Inc.*, 441 B.R. 496, 509–10 (Bankr.E.D.Va.2010) (suppliers' right to reclamation under UCC lost because suppliers failed to object to debtor's liquidation of entire inventory as part of going out of business sale and inventory was sold to buyers in ordinary course or to other good faith purchasers during sale); *Amarillo Nat'l Bank v. Komatsu Zenoah Am., Inc.*, 991 F.2d 273, 277 (5th Cir.1993) (debtor's goods could be classified as inventory under UCC while on debtor's shelves waiting to be sold in ordinary course of business). The trial court's conclusion that any purchase made as part of a liquidation sale does not qualify as a sale in the ordinary course of business was too broad. However, we conclude the trial court did not err by determining that, in this case, FINOVA's sale of the aircraft while liquidating its assets was not a sale in the ordinary course of business.

In addition to the parties' stipulations, the trial court also admitted into evidence the parties' joint exhibit 4, FINOVA's June 13, 2001 disclosure statement in the bankruptcy proceedings, and the parties' joint exhibit 49, FINOVA's Form 10–Q for the quarter ending June 30, 2008. In the disclosure statement, FINOVA stated a new $6,000,000,000 loan, cash on hand, and $3,260,000,000 in New Senior Notes would enable the debtors to restructure their debt. In the Form 10–Q, FINOVA stated:

> Since emergence from chapter 11 bankruptcy proceedings in August 2001, our business activities have been limited to maximizing the value of our portfolio through the orderly collection of our assets. These activities included collection efforts pursuant to underlying contractual terms, negotiation of prepayments and sales of assets or collateral. We have substantially completed the liquidation of our portfolio and our focus has shifted to the continued wind down of our operations and future dissolution of our entities. We are prohibited by the Indenture (the "Indenture") governing our 7.5% Senior Secured Notes (the "Senior Notes") from engaging in any new lending activities or other business. Any funds generated in excess of cash reserves permitted by our debt agreements have been used to reduce obligations to our creditors.

FINOVA noted that it "clearly [did] not have sufficient assets to fully repay the Senior Note obligation." FINOVA stated it recognized before April 1, 2005 that it would not be able to repay the Senior Notes in full and, therefore, sought relief from the bankruptcy court regarding distributions to stockholders.

Wells Fargo asserts that FINOVA's pre-bankruptcy business involved the financing and leasing of aircraft and that FINOVA sold a substantial number of aircraft to third parties at the end of the lease terms applicable to the aircraft. Therefore, Wells Fargo argues, the sale of

the aircraft in this case was done in the ordinary court of FINOVA's business. However, after emerging from bankruptcy in 2001, FINOVA's only "business" was liquidating its remaining assets. Regardless of whether the sale of the aircraft could have been a sale in the ordinary course of FINOVA's pre-bankruptcy leasing and financing business, FINOVA did not have an ongoing business post-bankruptcy involving the leasing of goods and was prohibited by the Senior Notes from engaging in new lending activities or other business. After emerging from bankruptcy, FINOVA no longer actively engaged in leasing or selling goods as part of an ongoing business. *See* Tex. Bus. & Com.Code Ann. §§ 1.201(9), 2A.103(a)(1); *In re Winn*, 177 B.R. at 257. Rather, it had assets that it was liquidating to pay creditors. The sale of capital assets, as opposed to the sale of the inventory of an ongoing business, is not a sale in the ordinary course of business. *See Aircraft Trading & Servs., Inc. v. Braniff, Inc.*, 819 F.2d 1227, 1232–33 (2d Cir.1987) (applying New York law interpreting UCC); *In re Winn*, 177 B.R. at 257.

We conclude the trial court did not err by determining that FINOVA, post-bankruptcy, was not engaged in the leasing of aircraft or in the sale of aircraft incidental to FINOVA's leasing and financing business. The trial court also did not err by concluding that FINOVA's sale of the aircraft at issue in this case as part of FINOVA's liquidation of all its assets was not a sale in the ordinary course of business. *See Sindone*, 432 N.Y.S.2d at 781, 105 Misc.2d at 638–39; *Lopa*, 85 B.R. at 240. Because Wells Fargo failed to establish it was a buyer in ordinary course, we need not consider whether the thrust reverser was an accession to the aircraft. *See* Tex. R.App. P. 47.1. We resolve Wells Fargo's second issue against it.

## Damages

In its third through sixth issues, Wells Fargo contends the trial court erred in awarding damages to RPK because (1) there was no evidence that Wells Fargo caused the delamination in the thrust reverser; (2) there was no evidence to support the damage award for lost profits because RPK's expert's testimony was unreliable; and (3) even if RPK's expert's testimony about lost profits was reliable, it does not support the damages awarded for past and future lost profits.

### Standard of Review

A party challenging the legal sufficiency of the evidence to support a finding on an issue for which it did not have the burden of proof at trial must show there is no evidence to support the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex.2011) (op. on reh'g). When reviewing a legal sufficiency challenge, we consider evidence favorable to the finding if a reasonable fact finder could consider it, and disregard evidence contrary to the finding unless a reasonable fact finder could not disregard it. *Id.; City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then the fact finder must be allowed to do so. *City of Keller*, 168 S.W.3d at 822, 827. We may not substitute our judgment for that of the fact finder, "so long as the evidence falls within this zone of reasonable disagreement." *Id.* at 822. If the evidence allows only one inference, neither the fact finder nor the reviewing court may disregard it. *Id.* "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827.

### Damages for Defect

In its third issue, Wells Fargo asserts the trial court erred by awarding $350,000 for the cost to repair the delamination on the thrust reverser because there is no evidence Wells Fargo caused the delamination. RPK contends that, under the terms of the lease, it was entitled to the return of the thrust reverser in a serviceable condition when the lease either expired or was terminated. Alternatively, RPK contends the unserviceable condition of the thrust reverser was a direct consequence of having NORDAM inspect the part at a time when it was not scheduled for inspection and was not required to be inspected by any maintenance program applicable to the aircraft.

▆▆▆▆ The trial court found that, due to the delamination, the thrust reverser had been declared unserviceable and the cost to repair the thrust reverser is $350,000. It also found the delamination was discovered during the NORDAM inspection and that the inspection was not required by the lease or the maintenance plan for the aircraft. It concluded:

> Because RPK is entitled to a Thrust Reverser in serviceable condition pursuant to the Engine Lease and Wells Fargo's possession of the Thrust Reverser is subject to RPK's rights under the Engine Lease, RPK is entitled to repair damages from Wells Fargo in an amount of $350,000 to return the Thrust Reverser to serviceable condition.

Although the trial court made no conclusion of law regarding whether RPK was entitled to damages for the cost of repair due to Wells Fargo's decision to have NORDAM inspect the thrust reverser, we will consider whether the award of damages can be affirmed on this basis. *See OAIC Commercial Assets, L.L.C.,* 234 S.W.3d at 736.[5]

▆▆▆▆ A plaintiff must prove damages before recovery is allowed for conversion. *Deaton,* 939 S.W.2d at 147; *Alan Reuber Chevrolet, Inc.,* 287 S.W.3d at 889. The usual measure of damages for conversion is the fair market value of the property at the time and place of conversion. *Deaton,* 939 S.W.2d at 147–48. However, the plaintiff can alternatively seek the return of the property and damages for its loss of use during the time of its detention. *Wiese v. Pro Am Servs., Inc.,* 317 S.W.3d 857, 862 (Tex.App.-Houston [14th Dist.] 2010, no pet.); *Varel Mfg. Co.,* 990 S.W.2d at 497. Damages are limited to the amount necessary to compensate the plaintiff for the actual losses or injuries sustained as a natural and proximate result of the defendant's conversion. *Deaton,* 939 S.W.2d at 148. A conversion should not unjustly enrich the wrongdoer or the complaining party. *Id.*

▆▆▆▆ In its second amended petition, RPK sought as damages for its conversion claim "lost use of the Thrust Reverser, lost profits, lost value, and attorneys' fees."[6]

---

**5.** We recognize that when the trial court's judgment rests upon the specific grounds set out in the findings of fact and conclusions of law, we are not permitted to assume omitted findings or conclusions necessary to any other grounds for the judgment. *See Leonard v. Eskew,* 731 S.W.2d 124, 132 (Tex.App.-Austin 1987, writ ref'd n.r.e.). However, conversion was the only ground for recovery of damages pleaded in this case. Any omitted conclusions of law relating to the NORDAM inspec-

tion would, therefore, be relevant to this legal theory and not another ground of recovery. An incorrect conclusion of law does not require reversal if the controlling findings of fact will support a correct legal theory. *In re L.A.F.,* 270 S.W.3d 735, 739 (Tex.App.-Dallas 2008, pet. denied).

**6.** At trial, the "lost value" sought by RPK was the cost to repair the delamination on the thrust reverser and the impact of the delami-

It did not elect to recover damages based on the fair market value of the purportedly undamaged thrust reverser as of the date of the conversion. Based on the remedy it elected, RPK was entitled to the return of the thrust reverser and any proven damages for lost use during the time of the conversion. *Wiese,* 317 S.W.3d at 862.

John Berry Milson, who works with the financial technical practice at SH & E, a consulting firm retained by RPK, testified delamination is caused by moisture seeping into small areas of disbonding on a part. As the moisture freezes and expands, more of the panel will "break away." There was evidence that inspections of the thrust reverser prior to the NORDAM inspection did not detect the delamination. However, all witnesses who testified about the delamination stated there was no way to determine when the delamination occurred. Wells Fargo's discovery of the delamination during the period of conversion did not establish the delamination process began, rather than just continued, during the period of the conversion.

There was no evidence the delamination was a natural and proximate result of Wells Fargo's conversion of the thrust reverser. *See First State Bank, N.A. v. Morse,* 227 S.W.3d 820, 829 (Tex.App.-Amarillo 2007, no pet.) (damages recoverable to redress conversion must naturally and proximately arise from defendant's wrong and must be a foreseeable consequence of the misconduct); *see also Deaton,* 939 S.W.2d at 148. Because there is no evidence that Wells Fargo's exercising possession over the thrust reverser caused the delamination, the trial court's findings of fact relating to the NORDAM inspection do not support the award of cost to repair the thrust reverser.

nation on the market value of the thrust re-

We next turn to the trial court's conclusion that Wells Fargo was bound by the terms of the lease to return the thrust reverser in a serviceable condition and, therefore, must pay the cost to repair the delamination. RPK relies on section 2A.305(a) of the business and commerce code to support its argument that Wells Fargo is bound under the lease between RPK and ATA. Section 2A.305(a) states that, subject to provisions not applicable in this case, "a buyer or sublessee from the lessee of goods under an existing lease contract obtains, to the extent of the interest transferred, the leasehold interest in the goods that the lessee had or had power to transfer" and "takes subject to the existing lease contract." TEX. BUS. & COM. CODE ANN. § 2A.305(a). As set out above, we agree with RPK that Wells Fargo did not receive title to the thrust reverser, but took it subject to RPK's ownership interest. *See id.* However, section 2A.305(a) addresses only the issue of title as it pertains to the sale or sublease of an item subject to an existing lease. It does not statutorily bind the buyer or sublessee of the item to the lease terms. *See id.* Section 2A.305(a) of the business and commerce code does not require Wells Fargo to comply with the terms of the lease between RPK and ATA about which Wells Fargo had no knowledge. *See Jones v. Cooper Indus., Inc.,* 938 S.W.2d 118, 124 (Tex.App.-Houston [14th Dist.] 1996, writ denied) ("The assignee of a contract is not bound to perform the assignor's obligations under the contract unless they are expressly or impliedly assumed by the assignee."). We conclude section 2A.305 does not allow RPK to recover on its tort claim against Wells Fargo for what are essentially contractual damages based on the lease with ATA.

verser.

The trial court erroneously concluded RPK could recover the cost to repair the thrust reverser from Wells Fargo based on RPK's conversion claim. We resolve Wells Fargo's third issue in its favor and render judgment that RPK take nothing on its claim for cost to repair the thrust reverser.

*Lost Profits*

In its fourth issue, Wells Fargo argues the trial court erred by awarding damages for RPK's lost profits because the only evidence offered to support these damages was the testimony of RPK's expert witness, Ken De Jaeger. Wells Fargo complains De Jaeger's methodology was flawed and his testimony was unreliable and, therefore, there was essentially no evidence to support the trial court's award of lost profits.

*Applicable Facts*

De Jaeger testified he works in SH & E's Financial Technical Services Group. He has a masters of business administration degree and is a certified appraiser with the International Society of Transport Aircraft Trading Appraisal Program (IS-TAT). He was certified as an appraiser by ISTAT in 1997 and as a senior appraiser in 2008. His field of expertise is appraisal and asset management. Asset management involves the buying, selling, and leasing of aircraft and related parts. He provides appraisals, remarkets aircraft, helps airlines purchase aircraft, performs maintenance reviews of airlines, and prepares industry reports. He appraises anything aviation-related, including spare parts such as thrust reversers. He was retained by RPK to provide a diminution in value of the thrust reverser and damages relating to loss of use and lost profits.

De Jaeger testified aviation industry data concerning the sale and lease of spare parts, such as thrust reversers, is "very limited." Only a "few people" buy and sell thrust reversers because they are very expensive and are "long-lifed" assets. The part stays "on wing" for a long time and demand for the part is very sporadic. Moreover, data concerning sales and leases of thrust reversers is generally deemed confidential by those involved in the transactions.

De Jaeger testified the lease between ATA and RPK for the thrust reverser was a "leverage lease." A leverage lease is typically a long-term financing arrangement used for new, "high dollar" equipment. A leverage lease involves nonrecourse lenders and tax benefits to the lessee. A leverage lease involving a thrust reverser is not common and there is not currently a leverage lease market in the United States for thrust reversers.

De Jaeger performed a current market value analysis in this case to determine the market value and the lease rate for the thrust reverser. To conduct such an analysis, he researches the market, determines the current market value of the asset through an internal SH & E database, looks at how many of those assets are for sale or lease in the market, and determines a value. De Jaeger testified he first searched SH & E's internal database for thrust reversers. SH & E's internal database contains appraisals on over eight million parts. However, the only appraisals for thrust reversers contained in the database were too old to be relevant.

De Jaeger then researched the Inventory Locator Service (ILS), a database that many parties use to list spare parts for sale. He first checked the ILS for thrust reversers when ATA declared bankruptcy in April 2008, and determined there were no thrust reversers on the market at that time. He checked the ILS in July 2009 when he prepared his first report and,

again, there were no thrust reversers on the market. He checked the ILS for a third time in February 2010, just prior to trial, and determined there were ten thrust reversers on the market. De Jaeger believed the market had changed due to the economy and some aircraft "being parted out."

De Jaeger also contacted people he knew that either operated the "757" aircraft at issue in this case, overhauled 757 thrust reversers, or had 757 spare parts to sell "from time to time." Although he contacted over twenty people, not everyone responded. Of those responding, Willis Lease indicated an overhauled thrust reverser had a market value between $1.2 and $1.5 million and a serviceable thrust reverser had a value between $600,000 and $1,000,000. Flight Director indicated an overhauled thrust reverser had a value between $1.3 and $1.5 million and provided lease rates of $30,000 to $35,000 for sixty to ninety days and stated there could be sporadic long-term leases of thrust reversers in the amount of $15,000 to $20,000 per month. He received a total of seven to ten "data points" and believed they were all "in line" with Willis Lease and Flight Director. De Jaeger did not indicate how many of the data points related to the market value of a thrust reverser as opposed to lease rates.

The trial court admitted into evidence a compilation of email responses that De Jaeger received relating to his inquiries. The emails reflect De Jaeger and other individuals employed by SH & E contacted outside companies regarding the market value and lease rates of thrust reversers. Many of the emails detailed to De Jaeger conversations the other SH & E employees had with employees of the outside companies. As to lease rates, the emails

indicate Ashley Cooper from TES stated thrust reversers rented on an AOG basis at $3,000 per day per half.[7] Nick Dodd indicated TEMCO Canada had never leased a thrust reverser separately from an aircraft engine, but he would "expect" the lease rate would be $2,000 to $3,000 per day per half. "Graeme from Willis" had "no clue" about lease rates for thrust reversers. According to Elizabeth Morgan at FDI, thrust reversers were "swapped out no more than 4x/year (90 days typical) and are generally fully utilized." However, Steve Horner, of an unidentified company, stated the thrust reverser market "has eased w/certain lessors having availability." A "Manager–Flight Controls & Thrust Reversers of a U.S. based aviation large equipment lessor" indicated a typical lease rate was $30,000 to $35,000 per month, exclusive of recertification fees. De Jaeger testified he could not obtain leases or contracts to support the data because this information is confidential. He also could not provide information on the entities that bought or sold thrust reversers. De Jaeger admitted that leases of thrust reversers have a range of rental rates that vary depending on factors such as the location of the party leasing the thrust reverser, who operates the thrust reverser, how the thrust reverser is maintained, the environment, the length of the lease, and the number of thrust reversers on the market.

De Jaeger opined that RPK would incur expenses of $20,000 to draft an initial thrust reverser lease and seventy-five percent of that cost for each subsequent lease. It would also incur administrative expenses of $10,000 and initial legal expenses of $5,000. De Jaeger used a medium term lease rate of $35,000 per month for a sixty to ninety day period and an AOG daily

---

7. De Jaeger testified that an AOG or "aircraft on the ground lease" is a short term lease for an interim replacement while a failed part is being repaired.

lease rate of $5,000. Using a mixture of the medium term and AOG lease rates with varying remarketing periods between leases and subtracting the related expenses, De Jaeger opined that RPK suffered $498,480 in lost profits between April 2, 2008 and March 1, 2010 if the thrust reverser had been returned to RPK in serviceable condition. If RPK was required to repair the thrust reverser, RPK suffered $149,521 in lost profits over the same period of time.

The trial court found (1) the typical medium term lease rate for a thrust reverser in May 2008 was $35,000 per month, (2) the typical medium term lease rate for a thrust reverser at the time of trial was $30,000 per month, (3) the typical short term market lease rate at the time of trial was $5,000 per day, and (4) RPK had suffered $498,480 in lost profits from the loss of use of the thrust reverser. The trial court concluded the "testimony of Plaintiffs' expert witness Kenneth De Jaeger, as a matter of law, satisfies the standard for the recovery of lost profits under Texas law" and awarded RPK $498,480 for past lost profits and $30,000 per month, commencing immediately, for so long as Wells Fargo retained possession of the thrust reverser.

### Analysis

■■■ The usual measure of damages for loss of use of property is the reasonable cost of renting replacement property. *Cessna Aircraft Co. v. Aircraft Network, L.L.C.*, 213 S.W.3d 455, 465 (Tex.App.-Dallas 2006, pet. denied) (op. on reh'g). However, a party who loses the opportunity to accrue earnings from the use of its equipment may also be entitled to recover loss of use damages in the form of lost profits. *See Amelia's Auto., Inc. v. Rodriguez*, 921 S.W.2d 767, 771 (Tex.App.-San Antonio 1996, no writ) (considering lost profits as loss of use damages where plaintiff was deprived of use of tow truck); *Chem. Express Carriers, Inc. v. French*, 759 S.W.2d 683, 687–88 (Tex.App.-Corpus Christi 1988, writ denied) (discussing lost profits as loss of use damages where plaintiff lost use of an airplane). We conclude lost profits was an appropriate measure of damages for RPK's loss of use of the thrust reverser.

■■■ Lost profits are damages for the loss of net income to a business. *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex.2002); *Exel Transp. Servs., Inc. v. Aim High Logistics Servs., LLC*, 323 S.W.3d 224, 232 (Tex.App.-Dallas 2010, pet. denied). Recovery for lost profits does not require that the loss be susceptible of exact calculation. *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex.2010) (quoting *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex.1992)). However, the injured party must do more than show that they suffered some lost profits. *Id.* A party seeking to recover lost profits must prove the loss through competent evidence with reasonable certainty. *Id.; Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994) (per curiam). What constitutes reasonably certain evidence of lost profits is a fact intensive determination. *Swinnea*, 318 S.W.3d at 876; *Szczepanik*, 883 S.W.2d at 649. However, "[a]s a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Swinnea*, 318 S.W.3d at 876; *see also Exel Transp. Servs., Inc.*, 323 S.W.3d at 232. "Reasonable certainty" is not demonstrated when the profits claimed to be lost are largely speculative, as from an activity dependent on uncertain or changing market condition, on chancy business opportunities, or on promotion of untested products or entry into unknown markets or unproven enterprises. *Tex. Instru-*

*ments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex.1994); *Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.*, 131 S.W.3d 203, 206–07 (Tex. App.-Fort Worth 2004, pet. denied).

■■■■■■ To be relevant, an expert's opinion must be based on the facts; to be reliable, the opinion must be based on sound reasoning and methodology. *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex.2009). Texas rule of evidence 703 allows an expert to rely upon facts or data of a type reasonably relied upon by experts in the field, even if the facts or data are inadmissible in evidence. Tex.R. Evid. 703. However, "if the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex.1997); *see also Royce Homes, L.P. v. Neel*, No. 10–03–00127–CV, 2005 WL 428431, at *5 (Tex.App.-Waco Feb. 23, 2005, pet. denied) (mem. op.) (applying *Havner* to issue of whether expert's testimony regarding cost of repair was reliable). When the expert "brings to court little more than his credentials and a subjective opinion," this is not evidence that would support a judgment. *Havner*, 953 S.W.2d at 714.

■■■■ Here, De Jaeger testified his usual methodology in valuing an asset involved researching the market, determining the current market value through SH & E's internal database, and looking at how many of the asset were for sale or lease. De Jaeger admitted, however, that there was no relevant information in SH &

E's database about lease rates for thrust reversers and the ILS contained no information on lease rates for thrust reversers in April 2008 or in July 2009.[8] Accordingly, De Jaeger could not use two of the prongs of his stated methodology. De Jaeger's opinions about the lease rate for a thrust reverser were premised entirely on "market research" consisting of data that was collected by word of mouth from a few people employed by companies in the aviation industry. De Jaeger could not verify the information obtained based on review of contracts or leases because the contracts and leases were deemed confidential. He could not identify some of the individuals on whose verbal opinions he relied or the companies that purportedly leased thrust reversers at the rental rates included in his analysis. At least one of the individuals contacted by De Jaeger had no experience in leasing thrust reversers and offered a lease rate based purely on speculation.

■■■■ Without any documentary evidence to support the information provided by his contacts in the industry, De Jaeger took the lease rates provided by these individuals and, without explaining his analytical basis, assumed a mixture of medium term leases and AOG leases interspersed with what appears to be arbitrary remarketing periods. De Jaeger failed to identify any specific lease that was available to or was lost by RPK. The trial court had nothing more than De Jaeger's opinion that RPK could have located and entered into the assumed leases that formed the basis of De Jaeger's opinion. "[T]he bare assertion that contracts were lost does not demonstrate a reasonably certain objective

---

8. De Jaeger testified the ILS contained information on ten thrust reversers in February 2010. However, he did not state whether these thrust reversers were for sale or for lease or the lease rate for any thrust reverser in February 2010. There was also no indication that De Jaeger relied on any information available in February 2010 to support his opinion regarding the profits lost by RPK in 2008 and 2009.

determination of lost profits." *Holt,* 835 S.W.2d at 85.

 De Jaeger is qualified to render expert testimony on the sale and leasing of aircraft parts. Opinions concerning lost profits may be competent evidence, if the opinion is based on objective facts, figures, or data from which the amount of lost profits may be ascertained. *KMG Kanal–Muller–Gruppe Deutschland GmbH & Co. v. Davis,* 175 S.W.3d 379, 391 (Tex.App.-Houston [1st Dist.] 2005, no pet.). However, an expert's opinion could be unreliable if it is based on assumed facts that vary from the actual facts. *Whirlpool Corp. v. Camacho,* 298 S.W.3d 631, 637 (Tex.2009). Unreliable expert testimony is legally no evidence. *Havner,* 953 S.W.2d at 712; *Plunkett v. Conn. Gen. Life Ins. Co.,* 285 S.W.3d 106, 113 (Tex. App.-Dallas 2009, pet. denied). In this case, De Jaeger's opinions were based on assumed facts about available leases and on unsupported, verbal information about lease rates. De Jaeger failed to provide the trial court with any objective evidence to substantiate his opinions. We conclude De Jaeger's opinions regarding the available leases between April 2008 and the time of trial, the lease rates for the leases that De Jaeger assumed RPK would enter into, and RPK's lost profits based on those purportedly lost leases were not based on objective facts, figures, or data and, therefore, constituted no evidence of RPK's lost profits. *See Holt,* 835 S.W.2d at 85; *see also Havner,* 953 S.W.2d at 712, 714; *Plunkett,* 285 S.W.3d at 113. We resolve Wells Fargo's fourth issue in its favor.

In its fifth and sixth issues, Wells Fargo complains that, even if De Jaeger's testimony was reliable, the trial court erred by awarding RPK damages for past profits of $498,480 and for future loss of use of $30,000 per month until the thrust reverser was returned because De Jaeger's testimony does not support these awards. Due to our resolution of Wells Fargo's fourth issue, we need not address these complaints. *See* TEX.R.APP. P. 47.1. We render judgment that RPK take nothing on its claim for past and future loss of use of the thrust reverser. *See Deaton,* 939 S.W.2d at 147.

## Attorney's Fees

In its seventh issue, Wells Fargo asserts the trial court erred by awarding RPK attorneys' fees because it erred in granting RPK a declaratory judgment. The trial court concluded the "attorneys' fees and expenses incurred by RPK in the prosecution of its claims were reasonable and necessary. Therefore, RPK is entitled to recover all of its attorneys' fees and expenses incurred in the prosecution of this matter." We first note that RPK sought to recover attorneys' fees both under its claim for conversion and pursuant to its request for a declaratory judgment and the trial court awarded all fees incurred by RPK in the prosecution of its "claims."

On this record, we cannot determine on what basis the trial court awarded attorneys' fees or whether there was a sufficient basis to support declaratory relief separate from the conversion claim. *See Etan,* 359 S.W.3d at 624 ("When a claim for declaratory relief is merely 'tacked onto' statutory or common-law claims that do not permit fees, allowing the UDJA to serve as a basis for fees 'would violate the rule that specific provisions should prevail over general ones.' The declaratory judgment claim must do more 'than merely duplicate the issues litigated' via the contract or tort claims." (citations omitted)); *City of Carrollton v. RIHR Inc.,* 308 S.W.3d 444, 454–55(Tex. App.-Dallas 2010, pet. denied); *Park Cities Ltd. P'ship v. Transpo Funding Corp.,* 131 S.W.3d 654,

661 (Tex.App.-Dallas 2004, pet. denied) (although declaratory relief plea may not be coupled to damage action simply in order to pave way to recover attorneys' fees, declaratory relief may be appropriate where there was an actual, real, justiciable controversy); *Wiese*, 317 S.W.3d at 861 (attorneys' fees not recoverable as actual damages on conversion claim). Further, our opinion in this case significantly changed the trial court's judgment. Accordingly, we conclude the issue of attorney's fees must be reversed and remanded to the trial court for reconsideration in light of this opinion. *See State Farm Lloyds v. C.M.W.*, 53 S.W.3d 877, 894–95 (Tex.App.-Dallas 2001, pet. denied) (reversing and remanding attorney's fees awarded under Declaratory Judgment Act "because the record does not reflect the trial court's reasons for its award of fees to [the prevailing party], there is no evidence to indicate whether the trial court's award of fees would also be equitable and just in light of our opinion in this case"). We resolve Wells Fargo's seventh issue in its favor.

### Conclusion

We affirm the trial court's conclusions that (1) RPK's conversion claim is not barred by the statute of limitations and (2) Wells Fargo did not receive title to the thrust reverser as a buyer in the ordinary course of business under the UCC. On its conversion claim, RPK elected to recover possession of the thrust reverser and lost profits, rather than the fair market value of the thrust reverser at the time of the conversion. We conclude there is no evidence that the delamination of the thrust reverser was a natural and proximate result of Wells Fargo's conversion. We further conclude RPK's expert's testimony failed to establish RPK's lost profits with reasonable certainty. We, therefore, reverse the portion of the trial court's judg-

ment awarding RPK damages for cost to repair the thrust reverser and for past and future lost profits and render judgment RPK take nothing on its damages claim. We affirm the trial court's judgment awarding possession of the thrust reverser to RPK. We reverse and remand the trial court's award of attorney's fees to RPK for further proceedings consistent with this opinion.