ACCEPTED
03-15-00088-CV
5696947
THIRD COURT OF APPEALS
AUSTIN, TEXAS
6/16/2015 2:29:17 PM
JEFFREY D. KYLE
CLERK

No. 03-15-00088-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
6/16/2015 2:29:17 PM
JEFFREY D. KYLE
Clerk

## IN THE THIRD COURT OF APPEALS
## AUSTIN, TEXAS

## GRAYCO TOWN LAKE INVESTMENT 2007, LP
*Appellant,*

v.

## COINMACH CORPORATION
*Appellee.*

On Appeal from the County Court at Law Number 1
of Travis County, Texas, Trial Court Case No. C-1-CV-08-09655,
Hon. Eric Shepperd, Presiding

## REPLY BRIEF OF APPELLANT

Dobrowski, Larkin & Johnson LLP
    Frederick T. Johnson
    SBN 00785429
    Cody W. Stafford
    SBN 24068238
    Akilah F. Craig
    SBN 24076194
4601 Washington Ave, Suite 300
Houston, Texas 77007
**Counsel for Appellant**

**ORAL ARGUMENT REQUESTED**               June 16, 2015

# TABLE OF CONTENTS

Page

ARGUMENT IN REPLY .......................................................................... 1

A.    GRAYCO HAD NO NOTICE OF THE 2002 LEASE. ................................... 1

    1.    The Memorandum of Lease is insufficient to identify
the 2002 Lease. ......................................................................... 2

    2.    The presence of laundry machines at Regatta did not
provide notice of the 2002 Lease. ........................................... 10

B.    COINMACH'S ARGUMENT THAT GRAYCO BREACHED THE
2002 LEASE IS CONTRARY TO ITS OWN ADMISSIONS. ...................... 12

C.    COINMACH PRESENTED NO COMPETENT EVIDENCE OF DAMAGES. ... 14

    1.    Coinmach's "lost profits" are too speculative. .......................... 14

    2.    Kemmerer's testimony was flawed, unreliable, and
no evidence of damages. ......................................................... 17

        a.    Kemmerer based all of his opinions on an incorrect
date of breach. ................................................................... 18

        b.    Kemmerer incorrectly calculated the net present
value of the alleged lost profits. ........................................ 20

        c.    The trial court acknowledged that Kemmerer's
calculation was wrong. ...................................................... 21

        d.    Kemmerer's damages calculation is premised on an
unsupportable "average daily collection rate." ................... 22

D.     C&#111;&#105;&#110;&#109;&#97;&#99;&#104; FAILED TO PROVIDE ONE, COMPLETE CALCULATION OF LOST PROFITS, WHICH REQUIRES REVERSAL AND RENDITION...........23

PRAYER....................................................................................25

# INDEX OF AUTHORITIES

## Cases

*Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.,*
131 S.W.3d 203 (Tex. App.—Fort Worth 2004, pet. denied) ...............16

*Beutell v. United Coin Meter Co.,*
462 S.W.2d 334 (Tex. Civ. App.—Waco 1970, writ ref'd n.r.e.) .....10, 11

*Cadle Co. v. Caamano,*
930 S.W.2d 917 (Tex. App.—Houston [14th Dist.] 1996, no writ) ........8

*Holt Atherton Indus., Inc. v. Heine,*
835 S.W.2d 80 (Tex. 1992).................................................................15

*Hue Nguy. Chapa,*
305 S.W.3d 316 (Tex. App.—Houston [14th Dist.] 2009,
pet. denied) ......................................................................................8

*Kellmann v. Workstation Integrations, Inc.,*
332 S.W.3d 679 (Tex. App.—Houston [14th Dist.] 2010, no pet.) .......26

*Merrell Dow Pharms., Inc. v. Havner,*
953 S.W.2d 706 (Tex. 1997)...............................................................19

*Sandoval v. Guzman,*
2002 WL 31412529 (Tex. App.—Corpus Christ Oct. 24, 2002,
no pet.) .........................................................................................6, 7

*State v. Cent. Expressway Sign Assocs.,*
302 S.W.3d 866 (Tex. 2009)...............................................................18

*Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.,*
877 S.W.2d 276 (Tex. 1994)...............................................................16

*Univ. Gen. Hosp., LP v. Prexus Health Consultants, LLC,*
403 S.W.3d 547 (Tex. App.—Houston [14th Dist.] 2013, no pet.) .......25

*Vista Chevrolet, Inc. v. Lewis,*
709 S.W.2d 176, 177 (Tex. 1986)........................................................26

*Waggoner v. Morrow,*
932 S.W.2d 627 (Tex. App.—Houston [14th Dist.] 1996, no pet.) .........5

*Wells Fargo Bank Nw., N.A. v. RPK Capital XVI, L.L.C.,*
360 S.W.3d 691 (Tex. App.—Dallas 2012, no pet.) .............................19

*Wiley-Reiter Corp. v. Groce,*
693 S.W.2d 701 (Tex. App.—Houston [14th Dist.] 1985, no writ) ......14

## Rules

Tᴇx. R. Eᴠɪᴅ. 703...........................................................................18

# ARGUMENT IN REPLY

Coinmach's response brief is grounded on at least three distinct errors: (1) it misleadingly argues that Grayco's awareness that *a* laundry lease existed necessarily binds it to the undisclosed 2002 Lease; (2) it assumes that because Coinmach *had* made profits on its machines at times, that it was *entitled* to similar revenue in the future, despite the absence of any contractual guarantee of revenue; and (3) it defends its expert's calculation of lost profits, despite the fact that the calculations are hopelessly flawed, a fact the trial court tacitly admitted.

As a result, the trial court's judgment against Grayco is erroneous and must be reversed.

## A. GRAYCO HAD NO NOTICE OF THE 2002 LEASE.

Coinmach attempts to retroactively impose the 2002 Lease on Grayco by arguing that Grayco's knowledge that *a* laundry lease existed meant that it was automatically charged with constructive notice of the unrecorded 2002 Lease. But Coinmach's argument is legally untenable. If accepted, Coinmach's argument would bind purchasers to any unrecorded encumbrances that could ever *conceivably* be found through

an exhaustive search. That is not the standard, nor should it be. If accepted, every real estate purchaser's due diligence would be subjected to a post-hoc review in which the *reasonableness* of its due diligence would be judged based on the *accuracy* of its due diligence. But such a standard would introduce tremendous uncertainty into all real estate transactions. That is why the standard Coinmach advocates is unworkable, unacceptable, and a departure from Texas law.

The injustice in such a standard is on full display in this case. Here, Grayco conducted its due diligence and did not discover the 2002 Lease. 2 RR 83:17-24. This is unsurprising since the 2002 Lease was never recorded. 2 RR 23:24 – 24:1. Coinmach does not argue otherwise. Rather, Coinmach claims that (1) the Memorandum of Lease (which never mentions the 2002 Lease) was sufficient to put Grayco on notice of the terms of the 2002 Lease or (2) the presence of laundry machines at Regatta put Grayco on notice of the 2002 Lease. Neither is correct.

1. **The Memorandum of Lease is insufficient to identify the 2002 Lease.**

To fully appreciate the inadequacy of the Memorandum of Lease to put Grayco on notice of the 2002 Lease, the Court need only consider the facts as Grayco knew them. When Grayco decided to buy Regatta, it

conducted a due diligence search related to the property. 2 RR 83:2-4. That search revealed the only laundry lease that had been recorded: the 1992 Lease.[1] 2 RR 83:17-24. That search also revealed the recorded Memorandum of Lease on which Coinmach now hangs its hat. *Id.* But the Memorandum of Lease only vaguely references a "written Lease Agreement" related to "laundry rooms." **Tab C**.

The most logical "written Lease Agreement" related to "laundry rooms" to which the Memorandum of Lease referred was the recorded 1992 Lease. And, as Grayco continued to reasonably pursue all facts of which it was aware, all of the available evidence confirmed that logic. For instance, Regatta's seller, Foley, affirmatively represented to Grayco that Coinmach was the "successor-in-interest" to the 1992 Lease. **Tab D**, at GP 000064. Moreover, Coinmach itself never informed Grayco of the 2002 Lease, despite discussions between Grayco's agent (Greystar) and Coinmach at the time of purchase. *See, e.g.*, Ex. D-9.

---

[1] Coinmach contends that recording a memorandum of lease instead of the lease itself is "common practice" in the leasing industry. Coinmach Br. at 16, n.14. Indisputably, however, Coinmach could have recorded the 2002 Lease in the same manner that the 1992 Lease had been recorded. By deciding not to record the 2002 Lease, Coinmach ran the risk of an innocent purchaser failing to learn of its laundry lease; thus, this litigation. (Coinmach also claims—without citation to authority—that a memorandum of lease places the unrecorded lease within the chain of title.)

Indeed, as late as August 4, 2008, nearly a year after Regatta closed, Coinmach's Ed Greene wrote to Grayco:

> For your inspection and review, I am enclosing the following:
>
> A copy of the lease agreement dated January 30, 2002 for the Regatta Apartments. This lease was for a ten year period.
>
> . . .
>
> A copy of the Supplemental Agreement showing that Coinmach paid $14,000.00 for the lease.

Ex. D-21. Mr. Greene's letter is the first written evidence of the 2002 Lease being supplied to Grayco, nearly 15 months after Grayco acquired Regatta.

Coinmach claims the Memorandum of Lease refers to the 2002 Lease on its face because it is between two different entities than the 1992 Lease. But that argument misses the mark (and completely ignores Grayco's brief). Indeed, Grayco reasonably concluded that the Memorandum of Lease memorialized a renewal and extension of the 1992 Lease *by new parties*. Grayco Br. at 6. Thus, the very fact that new parties filed the Memorandum of Lease, which ostensibly referred to the already-recorded 1992 Lease, led to the reasonable conclusion that the new parties were adopting and renewing the 1992 Lease, which

was to renew automatically in 2002. Coinmach argues that the Memorandum of Lease made no mention of the parties to the 1992 Lease—De Narde and McNair—but neither did it refer to the 2002 Lease. If anything, Coinmach's argument only underscores the flaw inherent in the Memorandum of Lease and Coinmach's questionable decision to rely on it rather than record the 2002 Lease.

Coinmach's sole legal authority for its proposition is *Waggoner v. Morrow*, 932 S.W.2d 627 (Tex. App.—Houston [14th Dist.] 1996, no pet.). But *Waggoner* is inapposite. Indeed, *Waggoner* stands for the unremarkable proposition that a purchaser can be bound by an unrecorded encumbrance. Grayco does not argue otherwise. In *Waggoner*, however, the unrecorded partition was plainly referenced by the owner's deed, and the owner did not contend that she had been unable to find a copy upon diligent search and inquiry. *Id.* at 632. In this case, however, the issue is unique. There is no question that Grayco was on notice that *a* laundry lease existed; the question is whether Grayco can be bound by a second, unrecorded lease of which it had no knowledge or notice.

5

Grayco was aware of the recorded 1992 Lease. But, unlike the reference to the specific partitions in *Waggoner*, the Memorandum of Lease in this case refers generally to a "written Lease Agreement" that it fails to identify. And, unlike the partitions in *Waggoner*, in this case there were two laundry "lease agreements"—one recorded and one unrecorded, a fact unknown to Grayco but well known to Coinmach. Though the due diligence in *Waggoner* was bound to find the *correct* partition, there was no assurance that reasonable due diligence in this case would find the *unrecorded* laundry lease agreement; indeed, Grayco's reasonable due diligence only discovered the recorded 1992 Lease.

If anything, this case is similar to *Sandoval v. Guzman*, 2002 WL 31412529 (Tex. App.—Corpus Christ Oct. 24, 2002, no pet.) (not designated for publication). In *Sandoval*, a party (Sandoval) tried to enforce an unrecorded easement against a subsequent purchaser (Guzman). Like Coinmach here, Sandoval relied on *Waggoner* to argue that an unrecorded partition constitutes notice. *Id.* at *4. However, the court of appeals summarily rejected that argument, noting that one is only bound by recitals contained in recorded instruments that are an

6

essential link in the purchaser's chain of title: "A purchaser is bound by every recital, reference, and reservation contained in or disclosed by an instrument **which forms an essential link in the chain of title under which he claims.**" *Id.* The *Sandoval* court indicated that no such constructive notice arises for instruments that are not an essential link in the purchaser's title:

> However, in [*Waggoner*], the partition created the easement, thereby making the partition an "essential link in the chain of title." In the case at bar, the Easement Agreement is not an essential link in the chain of title because it did not create Guzman's property. Also, Mendietta agreed to convey the property to Guzman on November 18, 1992, five days before the execution of the Easement Agreement. Guzman could not have inspected the grant of easement even with an extensive search. Furthermore, the Lueras did not record the Easement Agreement until after Guzman purchased the property. Therefore, neither Mendietta nor Guzman had constructive notice of the Easement Agreement.

*Id.* (internal citations omitted).

This comports with well-established principles of Texas property law. It has long been the law that one is only charged with constructive knowledge of the contents of a recorded instrument if that instrument is in the buyer's chain of title. "A purchaser of land is **only charged with information contained in instruments of record** which are in his chain of title at the time he purchases the property." *Cadle Co. v. Caamano*, 930

7

S.W.2d 917, 920 (Tex. App.—Houston [14th Dist.] 1996, no writ) (emphasis added); *see also Hue Nguy. Chapa*, 305 S.W.3d 316, 324 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) ("It is a well-established rule that **a deed or instrument lying outside of his chain of title imports no notice**.") (emphasis added). The instrument on which Coinmach relies does not provide notice of the *terms or existence* of the *2002 Lease*. At most, the recorded instrument provides notice only of the existence of an unspecified laundry lease. That does not suffice to charge Grayco with knowledge of either the terms or existence of the unrecorded 2002 Lease, especially when, as here, a diligent records search uncovered the recorded 1992 Lease,

Moreover, as in *Sandoval*, Coinmach's unrecorded 2002 Lease did not *create* Grayco's property; thus, the 2002 Lease was not an essential link in the chain of title. Coinmach also failed to record the 2002 Lease, which prevented Grayco from finding it and inspecting its terms during due diligence. Therefore, Grayco had no constructive notice of the 2002 Lease.

In the end, the only evidence demonstrates that Grayco reasonably pursued all facts of which it became aware regarding the

8

laundry lease. Those facts led it to reasonably conclude that the 1992 Lease governed the relationship between the parties. Coinmach argues, with the benefit of hindsight of course, that Grayco could have done more in its due diligence to discover the 2002 Lease. But that is not the standard. Purchasers of real property are not required to conduct a search in every *potentially conceivable* place an encumbrance *might* hide; rather, they must reasonably pursue facts of which they are aware. Grayco did that. Texas law requires nothing more.

Coinmach does not contend that it provided the 2002 Lease to Grayco prior to its purchase of Regatta. Nor is there any dispute that Coinmach failed to record the 2002 Lease. And the record affirmatively establishes that Foley (Regatta's seller) failed to provide the 2002 Lease to Grayco, and affirmatively led Grayco to believe the 1992 Lease had been renewed.[2] Consequently, the Memorandum of Lease did not provide Grayco constructive notice of the 2002 Lease.

---

[2] Coinmach makes much of the fact that Grayco did not sue Foley. But Grayco's decision not to sue another party has no bearing on its ability to defend itself from Coinmach's claims or on its bona fide purchaser status.

## 2. The presence of laundry machines at Regatta did not provide notice of the 2002 Lease.

Coinmach next argues that Grayco was aware of the 2002 Lease because Coinmach had possession of the laundry rooms at Regatta. But Coinmach's possession was equally consistent with the recorded 1992 Lease *and* the unrecorded 2002 Lease.

Coinmach's sole legal support for its argument is *Beutell v. United Coin Meter Co.*, 462 S.W.2d 334 (Tex. Civ. App.—Waco 1970, writ ref'd n.r.e.). In *Beutell*, the purchaser of an apartment building was charged with knowledge of an unrecorded laundry lease after it accepted payments under that lease for at least 15 months. *Id.* at 336. The court of appeals held that the presence of the lessee's laundry equipment in the laundry room, together with the acceptance of rentals, provided notice to the lessor of the laundry lease. *Id.* Coinmach tries to persuade the Court that *Beutell* is directly on point. But *Beutell* is of little value to the facts here because, like the other cases cited by Coinmach, it only concerns a purchaser being charged with a duty to find *one* lease. For the purchaser in *Beutell*, the laundry machines pointed them to the only laundry lease for the property. That is quite unlike the situation

in this case, where a diligent search revealed a recorded laundry lease, but failed to reveal an unrecorded laundry lease.

Grayco does not contend that it was unaware that Coinmach had a laundry lease at Regatta. Rather, Grayco contends that it had no notice, specifically, of the 2002 Lease. The mere presence of laundry machines in Regatta's laundry room might have provided Grayco with inquiry notice of a laundry lease, but it did not provide Grayco with notice of a specific unrecorded laundry lease. The laundry machines only imposed on Grayco a duty to conduct a reasonably diligent inquiry for a laundry lease, which Grayco did. Because the 2002 Lease was never recorded by Coinmach, however, Grayco did not discover that lease. Instead, Grayco discovered the 1992 Lease and the vague Memorandum of Lease, which confirmed the terms of the 1992 Lease among new parties. Grayco's reasonable search confirmed its understanding that the 1992 Lease governed its relationship with Coinmach. No other parties provided a different lease, nor did Coinmach alert Grayco to the 2002 Lease.

Coinmach finally argues that Grayco must have known about the 2002 Lease because Grayco's agent, Savanna Sharpe-Bogardus of

11

Greystar, allegedly made some notes on an email. Coinmach Br. at 18. But that argument fails for at least two reasons. First, the only evidence at trial is that Ms. Sharpe-Bogardus did not make the handwritten notes on the exhibit. Ex. C-1, Depo. of Savanna Sharpe-Bogardus, 49:20-50:7. No one testified otherwise. Second, the vague, mostly-undecipherable notes apparently refer to "2/2012"—which is approximately when the 1992 Lease would be expected to either renew or expire for the second time on its own terms. Thus, the email and the notes on it are consistent with Grayco's understanding that the 1992 Lease renewed in 2002 and would expire in 2012.

Consequently, there was no evidence, or factually insufficient evidence, that Grayco had notice of the 2002 Lease. Rather, the evidence established that Grayco was a bona fide purchaser of Regatta and not subject to the 2002 Lease.

B.    COINMACH'S ARGUMENT THAT GRAYCO BREACHED THE 2002 LEASE IS CONTRARY TO ITS OWN ADMISSIONS.

Of course, even if Grayco were bound by the 2002 Lease, Coinmach's claims still fail. *See* Grayco Br. at 24-27. In its brief, Coinmach fails to explain how Grayco's complete closure of Regatta is a breach, yet a decision to not renew tenant leases would not have been.

12

Coinmach admitted that Grayco could have renewed or not renewed as many or as few tenant leases as it wanted without breaching the 2002 Lease. *See, e.g.*, 2 RR 26:8-11, 35:21-36:2, 36:17-22.[3] Of course, that would necessarily have decreased—or even negated—Coinmach's revenue. Coinmach's argument then is a distinction without a difference: Grayco was empowered to effectively close Regatta by not renewing tenant leases, but Grayco had to keep the building "open" for the remainder of the laundry lease. That is the epitome of the tail wagging the dog, and it makes no sense.

Additionally, Coinmach now, for the first time, comes up with completely new alleged breaches of the 2002 Lease. Coinmach argues that Grayco failed to keep the laundry room clean and failed to "cooperate" with Coinmach under the 2002 Lease. Coinmach Br. at 20-22. Even if Coinmach had properly presented these arguments to the

---

[3] This admission also guts Coinmach's new argument that Grayco breached the 2002 Lease because the Real Estate Contract between Foley and Grayco Partners, LLC provided that no tenant leases of more than six months would be entered into. Coinmach Br. at 10, n.11. Not only does that argument make no sense on its face, Coinmach admits the 2002 Lease did not require renewal of any set number of tenant leases or any minimum occupancy.

trial court for consideration, Coinmach never tied any of its alleged damages to these supposed breaches. Thus, they fail as a matter of law.[4]

## C. COINMACH PRESENTED NO COMPETENT EVIDENCE OF DAMAGES.

Simply put, it was Coinmach's burden at trial to provide competent evidence of its damages. It failed to do so.

### 1. Coinmach's "lost profits" are too speculative.

Assuming, *arguendo*, the 2002 Lease bound Grayco, nothing in the 2002 Lease guaranteed any income to Coinmach. In its brief, Coinmach assumes that the mere fact that it had made profits at times in the past necessarily entitled it to profits in the future. Of course, Coinmach fails to buttress this argument with any legal authority and, indeed, it is inconsistent with Texas law on recovery of lost profits.

The rule concerning adequate evidence of lost profit damages is well established:

> Recovery for lost profits does not require that the loss be susceptible of exact calculation. **However, the injured party must do more than show that they suffered some lost profits. The amount of the loss must be shown by competent**

---

[4] With the exception of passing references to Grayco's supposed duty to maintain the laundry room, Coinmach never advanced these arguments until now. Coinmach did not rely on these supposed breaches as a basis for its causes of action. CR 213-16; 409-10. Because these theories were not pleaded or tried, they are waived on appeal. *Wiley-Reiter Corp. v. Groce*, 693 S.W.2d 701, 704 (Tex. App.—Houston [14th Dist.] 1985, no writ).

> evidence with <u>reasonable certainty</u>. What constitutes reasonably certain evidence of lost profits is a fact intensive determination. As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained.

*Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex. 1992) (citations omitted) (emphasis added). "Reasonable certainty" is not demonstrated when the profits claimed to be lost are largely speculative, as from an activity dependent on uncertain or changing market condition, on chancy business opportunities, or on promotion of untested products or entry into unknown markets or unproven enterprises. *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex. 1994); *Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.,* 131 S.W.3d 203, 206–07 (Tex. App.—Fort Worth 2004, pet. denied).

At trial, Coinmach was unable to meet the bar of "reasonable certainty." Rather, Coinmach's own collections inquiries established that the revenues from the laundry machines at Regatta began declining in 2006, and that trend continued into 2007. Ex. D-25 at GP 000008 – GP 000011. Coinmach blames Grayco for this decline and argues that "Grayco's actions in not keeping the laundry rooms clean

and maintained and in not renewing leases at the Apartments caused the laundry income to decline." Coinmach Br. at 23. But there are three problems with this: (1) Coinmach admitted that Grayco's decision not to renew tenant leases was not a breach of the 2002 Lease; (2) there is no evidence as to how many leases Grayco renewed or did not renew; and (3) Grayco did not own Regatta when the declines in revenue began— thus, the trial court could not possibly have found that the non-renewal of leases *caused* a decline in laundry income.

In any event, given Grayco's ability to renew or not renew tenant leases in the face of the crime and vandalism at Regatta, the market conditions for 2007 and beyond were not only entirely uncertain, they were also changing. Given that Coinmach's profits were entirely dependent on Regatta's occupancy and the tenants' voluntary use of the laundry machines, there is no way to accurately predict what Coinmach's profits would have been beyond 2007, regardless of whether Grayco bought the property. This is especially true given the increasing crime at Regatta and the failure of the previous owners to effectively manage the property. *See, e.g.,* Exs. D-9 and D-14. Coinmach's uncertainty as to its future profits—it admits it could not force Grayco

16

to make tenants use the machines—makes its lost profits award too speculative to sustain. 2 RR 26:15-18.

## 2. Kemmerer's testimony was flawed, unreliable, and no evidence of damages.

Coinmach's sole evidence related to the calculation of its alleged lost profits was Jon Kemmerer. His testimony and calculations, however, were fraught with incorrect assumptions and numerical sleights of hand—all of which had the undeniable effect of overinflating the damages calculation.

To be relevant, an expert's opinion must be based on the facts; to be reliable, the opinion must be based on sound reasoning and methodology. *State v. Cent. Expressway Sign Assocs.,* 302 S.W.3d 866, 870 (Tex. 2009). Rule 703 allows an expert to rely upon facts or data of a type reasonably relied upon by experts in the field, even if the facts or data are inadmissible in evidence. TEX. R. EVID. 703. However, "if the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable." *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 714 (Tex. 1997). When the expert "brings to court little more than his credentials and a subjective

17

opinion," this is not evidence that would support a judgment. *Havner,* 953 S.W.2d at 714; *see also Wells Fargo Bank Nw., N.A. v. RPK Capital XVI, L.L.C.,* 360 S.W.3d 691, 710-11 (Tex. App.—Dallas 2012, no pet.).

Here, Kemmerer provided an opinion founded on unreliable data and assumptions. Thus, Kemmerer's opinions and calculations are irrelevant and no evidence of Coinmach's alleged lost profits.

### a. Kemmerer based all of his opinions on an incorrect date of breach.

Contrary to Coinmach's argument, Kemmerer improperly concluded that Coinmach's damages began to accrue in March 2006, more than 18 months *before* Grayco's alleged breach (and one year before Grayco even owned Regatta). This error infects all of Kemmerer's calculations.

In essence, Kemmerer decided that Grayco was responsible for the decline in revenues beginning in 2006 at Regatta because it supposedly began to lease-down Regatta at that time. He admitted, however, that he did not know if Grayco owned Regatta at that time, nor was he ever aware of how many tenant leases Grayco chose to renew or not renew. 2 RR 47:3-25, 50:6-14. The decline in revenue at Regatta could have been due to any number of factors, none of which Kemmerer

considered.[5] Thus, Kemmerer had no basis to use only the period from December 22, 2004, through March 1, 2006, as his basis for the "normal" income from the machines. And Kemmerer's arbitrary decision to ignore the decline in revenue after March 1, 2006, undeniably resulted in overinflated "lost profits" that the trial court accepted.

For instance, in his report Kemmerer states that "Grayco made a decision to change the use of [Regatta] at some time prior to March 7, 2006. Pursuant to that decision, Grayco did not renew tenant leases at [Regatta] nor did it enter into any new tenant leases at [Regatta] . . . ." Ex. P-7 at p. 3 (¶ 5). As previously discussed, there is no evidence that Grayco had any ability to "change the use" of Regatta in 2006, because it did not own Regatta at that time. 2 RR 82:9-15. Moreover, Kemmerer admitted that, despite the statement in his report, he had no information regarding how many leases came up for renewal or were renewed. 2 RR 47:3-25; 50:11-51:1. So Kemmerer's testimony revealed not only that his underlying assumptions and supposed factual data

---

[5] For example, tenants could have chosen, on their own, not to renew their leases due to the conditions at Regatta. Or tenants may have simply stopped using the laundry rooms because the machines were in poor condition. Or perhaps tenants chose not to renew their leases and live elsewhere because they were upset with the previous owners. Though Kemmerer repeatedly states that he "took all differences into account" to provide his opinion, that was not true.

19

were unsupported by any competent evidence but were also complete misstatements.

Moreover, Kemmerer's report and testimony are at odds with Coinmach's own admissions. Coinmach admitted that Grayco's decision to lease-down Regatta—which would likely reduce laundry revenue—was not a breach of the 2002 Lease. *See, e.g.*, 2 RR 26:8-11, 35:21 – 36:2, 36:17-22. Kemmerer, on the other hand, made the lease-down a central component of Coinmach's supposed damages. Ex. P-7 at p. 5 (¶ 11).

### b. Kemmerer incorrectly calculated the net present value of the alleged lost profits.

Additionally, an essential part of Kemmerer's lost profits calculation was to discount five years of future lost profits to net present value. 2 RR 45:1-12; *see also* Ex. P-7 at p. 5 (¶ 12). Though unclear in his report, Kemmerer's testimony revealed that he discounted the present value back to March 2006, the date Grayco's supposed change of Regatta's use was made known to Coinmach. 2 RR 45:13-16. But that methodology is incorrect. Kemmerer's decision to discount the future lost profits to March 2006 is based on his underlying—yet incorrect—assumption that Grayco breached the 2002

Lease in 2006. 2 RR 43:1-44:3; Ex. P-1 at p. 5 (¶ 11). Again, this error resulted in erroneous damages figures.

### c. The trial court acknowledged that Kemmerer's calculation was wrong.

Coinmach attempts to argue its way out of this self-imposed conundrum by claiming that the trial court did not accept all of Kemmerer's calculations—those prior to Grayco's alleged breach—so "no harm, no foul." But, in making this argument, Coinmach all but admits—as it must—that Kemmerer's calculation is inherently flawed. In the end, then, Coinmach recognizes that its own expert miscalculated the damages, yet attempts to persuade the Court to ignore that discrepancy.

And, indeed, the trial court appears not to have included any lost profits prior to October 31, 2007, the alleged date of breach. So the trial court understood that Kemmerer's decision to include damages prior to the alleged breach was wholly unsupportable. What the trial court failed to understand, however, is that Kemmerer's decision to begin calculating damages in 2006 also undermined—and rendered unsupportable—his "average daily collection rate" upon which he

calculated *all* of the alleged lost profits, including the ones *after* October 31, 2007. The vagaries of that calculation are discussed next.

### d. Kemmerer's damages calculation is premised on an unsupportable "average daily collection rate."

Finally, Coinmach meets itself coming and going when it tries to defend Kemmerer's average daily collection rate of $99.81, which he used to calculate the supposed lost future profits. As discussed earlier, this daily rate is necessarily inflated because Kemmerer intentionally excluded approximately 18 months of data that showed lower revenues.

To create his daily rate, Kemmerer calculated average collections from December 22, 2004 until March 1, 2006. Ex. P-7 at p. 4 (¶ 9). Kemmerer then assumed Coinmach would make at least that much every day from March 2006 through March 2012. *See, e.g.*, Ex. P-7 at p. 7 (JEK-2). Coinmach defends this daily rate by saying Kemmerer was justified in not using any data after March 1, 2006, because Regatta's owner at the time—*not* Grayco—"was preparing to sell the property to Grayco's agent . . . ." Coinmach Br. at 26. But, as discussed above, Grayco had no control over Regatta in 2006. Even worse, Coinmach admitted at trial that even if Grayco had decided to not renew tenant leases, that would not be a breach of the 2002 Lease. Thus, it is illogical

to exclude revenues from the daily rate during a period in which Grayco had done nothing wrong.

Consequently, Kemmerer's damages calculation is inherently flawed from start to finish. The trial court even tacitly acknowledged that Kemmerer's calculation was inherently flawed when it excluded any lost profits prior to October 31, 2007. But excluding those lost profits does not remedy Kemmerer's calculation because, as discussed above, **all** of Kemmerer's calculations for lost profits are premised on a flawed daily rate that Kemmerer calculated using an incorrect date of breach, as well as other unjustifiable assumptions. Despite those flaws, the trial court entered judgment for speculative and incorrectly-calculated "lost profits." And now Coinmach invites this Court to affirm Kemmerer's flawed math based on flawed assumptions. The Court should decline the invitation.

D.   COINMACH FAILED TO PROVIDE ONE, COMPLETE CALCULATION OF LOST PROFITS, WHICH REQUIRES REVERSAL AND RENDITION.

A party seeking lost profit damages must demonstrate one complete calculation of lost profits. *Univ. Gen. Hosp., LP v. Prexus Health Consultants, LLC*, 403 S.W.3d 547, 551 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (citing cases). As discussed above,

23

Kemmerer's calculation—upon which Coinmach entirely relies—did not provide the trial court with one complete calculation of alleged lost profits. Thus, Coinmach presented legally insufficient evidence of its alleged lost profits.[6]

Generally, the proper legal remedy for legal insufficiency of the evidence is rendition of judgment for the appellant. *Vista Chevrolet, Inc. v. Lewis,* 709 S.W.2d 176, 177 (Tex. 1986). That same rule applies when the evidence of lost profits is insufficient. *Kellmann v. Workstation Integrations, Inc.,* 332 S.W.3d 679, 686-87 (Tex. App.— Houston [14th Dist.] 2010, no pet.). As a result, the Court should reverse the trial court's award of damages and render judgment that Coinmach take nothing.[7]

---

[6] As further discussed in Grayco's Brief, the evidence is also factually insufficient to support Coinmach's damages.

[7] The only damages Coinmach was awarded besides lost profits were attorney's fees. Because the award of attorney's fees was premised on Coinmach prevailing on its breach of contract claim, a reversal of the lost profits award necessarily requires reversal of the attorney's fees award.

## PRAYER

The judgment should be reversed and rendered. Alternatively, the judgment should be reversed and remanded for a new trial on damages.

Respectfully submitted,

DOBROWSKI, LARKIN & JOHNSON LLP

By: /s/ Cody W. Stafford
    Frederick T. Johnson
    SBN 00785429
    Cody W. Stafford
    SBN 24068238
    Akilah F. Craig
    SBN 24076194
    4601 Washington Ave, Suite 300
    Houston, Texas 77007
    713.659.2900 – Telephone
    713.659.2908 – Facsimile

COUNSEL FOR APPELLANT GRAYCO TOWN LAKE INVESTMENT 2007, LP

## CERTIFICATE OF COMPLIANCE

I hereby certify that the computer program used to prepare the foregoing Reply Brief of Appellant shows that 5,002 words are in the Reply Brief of Appellant. This word count does not include those words that TEX. R. APP. P. 9.4(i)(1) excludes from such word count. I further certify that the Reply Brief of Appellant was prepared using 14-point font with footnotes typed in 12-point font.

/s/ Cody W. Stafford
Cody W. Stafford

25

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of **Reply Brief of Appellant Grayco Town Lake Investment 2007, LP** has been served on this 16th day of June, 2015 as follows:

VIA CERTIFIED MAIL RETURN RECEIPT REQUEST
AND E-FILING
R. Kemp Kasling
Kasling, Hemphill, Dolezal & Atwell, L.L.P.
301 Congress Avenue, Suite 300
Austin, TX 78701

J. Bruce Bennett
Cardwell, Hart & Bennett, LLP
807 Brazos, Suite 1001
Austin, Texas 78701

*/s/ Cody W. Stafford*
Cody W. Stafford